Paul YENOFSKY, a minor, by his mother, Adele Yenofsky, as next friend, Plaintiff,

v.

Norman B. SILK, George F. Cullen, Joseph J. Semensi, Patrick T. McDonnell, John R. O'Riley, as Selectmen of the Town of Randolph, Massachusetts, Defendants.

Civ. A. No. 69–1194.

United States District Court
D. Massachusetts.

Nov. 14, 1969.

**992**

Daniel Levenson, Civil Liberties Union of Mass., Haskell Kassler, Boston, Mass., for plaintiff.

William Carr, Boston, Mass., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING TO PRELIMINARY INJUNCTION

GARRITY, District Judge.

On November 12, 1969, plaintiff filed a complaint under 42 U.S.C. § 1983 against five defendants named as Selectmen of the Town of Randolph, Massachusetts, asking that they be enjoined from refusing to issue to him a permit for a parade and public meeting in the town of Randolph on November 14 between the hours of 7:00 P.M. and midnight. According to the verified complaint, plaintiff is the coordinator in Randolph for the Massachusetts Peace Action Committee and on November 10 at a meeting of the defendant Selectmen was denied an application for the parade and public meeting requested. The application for the permit was addressed to the defendant Selectmen, was dated November 6, 1969, was signed by the plaintiff and two others and read as follows:

"We, the undersigned, submit this request for a parade permit. Said parade to be participated by approximately two hundred people. It will be executed in the form of a candle light procession beginning at 7 P.M. on November 12, 1969 from the parking lot of the former A & P Store and proceeding southerly on route 28 to the front of Town Hall. At this point the names of the dead from the Vietnam War will be read.

The procession shall be monitored and policed by our own people in attendance and conducted in a quiet, orderly fashion with due respect to town traffic.

We would appreciate your immediate approval of this request for the permit."

Some time after November 6 and before the meeting on November 10, the application was amended by the addition of a note reading as follows:

"If for any reason Wednesday November 12, 1969 is unacceptable to the Board of Selectmen we are perfectly willing to accept Friday, November 14, 1969 at 7 P.M. Procedures would be as outlined above."

According to the complaint, the selectmen's denial of the application for a parade permit followed statements by them such as that the plaintiff and members of his group should demonstrate where it will do the most good—Hanoi, Russia, and China; that there was a fear that something would happen to the marchers because the young fellows in town would want to back the boys in Vietnam; that while people have a right to express themselves, they cannot destroy society while doing it; and that plaintiff's request was like appeasement of Hitler and peace at any price.

An affidavit by plaintiff's counsel annexed to the complaint stated that he

telephoned each of the defendants on November 11 and informed them of the allegations of the complaint, and advised them of plaintiff's intention to file the complaint.

The court scheduled a hearing at November 13, 1969 at 3:00 P.M. on plaintiff's request for a preliminary injunction and ordered that the parties file briefs and affidavits at the commencement of the hearing. Defendants were represented at the hearing by William J. Carr, Esquire, who is a member of the bar of this court and also town counsel for the Town of Randolph. Briefs were filed by both parties, and defendants filed two affidavits in opposition. Statements of counsel were received by the court regarding testimony which persons present in the courtroom were prepared to give on the witness stand.

On the basis of the verified complaint and the affidavits and counsels' representations at the hearing, the court makes the following findings of fact and rulings of law.

### Findings of Fact

1. Plaintiff, 20 years old, has resided in Randolph for ten years and is a student at Emerson College. He is the coordinator in the town for the Massachusetts Peace Action Committee, which opposes United States participation in the conflict in Vietnam. On November 6 plaintiff filed an application with the defendant selectmen for a permit commencing at 7:00 P.M. on November 12 for a parade and a public meeting; thereafter he amended the requested date to November 14. Plaintiff and members of his group plan a candlelight procession in orderly fashion, with due respect to town traffic, of no more than 200 persons, some of whom will be carrying placards displaying slogans calling generally for an end to the war in Vietnam. The application, which is set forth verbatim above, also requests permission to assemble in front of the town hall and there to read from a list of American soldiers killed in Vietnam. At the hearing, the application for the permit was modified to conform to prayer (b) of the complaint so that the reading of the names of deceased soldiers would terminate at midnight.

2. The selectmen held a hearing on November 10 and heard plaintiff speak in support of the application and heard various townspeople express their views. After the debate Chairman Silk called for a show of hands and 74 citizens present were opposed to the parade and 13 in favor. The selectmen voted unanimously to deny the plaintiff's application and castigated the plaintiff for planning the parade. They did not in any way disavow their authority to issue a permit for a parade and public meeting, such as by referring plaintiff to the Chief of Police. They did not voice objections to the time, place, date or route of the march; nor did they suggest any alternative route. At the hearing in this Court, defense counsel stated that the selectmen meet on Monday nights and they would be happy to consider possible alternatives at their meeting on November 17.[1]

3. The only ordinance or regulation of the town of Randolph relating to parades appears in Article V, Section 1, of the Town's Traffic Rules and Orders, at p. 17, which reads as follows:

### Article V

#### Parades and Processions

Section 1. Parades and Processions. No funeral procession or parade containing two hundred (200) or more persons of fifty (50) or more vehicles, excepting the forces of the United States Army or Navy, the military forces of the Commonwealth of Massachusetts, and the forces of the police and fire departments shall occupy, march or proceed along any way

---

1. The court takes judicial notice of the fact that on November 13, 14 and 15 persons opposing the war in Vietnam are conducting parades and demonstrations in Washington, D.C., and elsewhere throughout the nation, called the second Vietnam Moratorium.

except in accordance with a permit issued by the Chief of Police, and such other regulations as are set forth herein which may apply.

4. The usual holiday parades have been conducted from time to time in Randolph, though none of them along the entire route of approximately three miles proposed in plaintiff's application. Most of the proposed route is on a state highway. Only the last few hundred yards are on a town street.

5. The application requested that the paraders march from the parking lot of a former A & P supermarket at the northern end of North Main Street. During the hearing, however, the plaintiff amended his application so that the procession would form on Bossi Avenue, which is a public, lighted, residential street running easterly off North Main Street in the vicinity of a baseball field used for Little League baseball games.

6. An affidavit by defendant Silk, who is Chairman of the board of selectmen, states that the proposed march will probably attract opponents to the marchers' views who might cause trouble which the police department might be unable to cope with; and that there is much traffic on North Main Street on Friday nights, when many residents do their shopping; and that along portions of the road there is sewerage and drainage construction work presently in progress.

### Conclusions of Law

■ At the hearing the defendants raised various objections, most of them surprisingly technical. The first was that the local traffic rule mentions "a permit issued by the Chief of Police" and application was made to the wrong authority. They conducted a full debate on the application and did not hesitate to vote upon it. The defendants are estopped from raising this objection by their conduct at the meeting of November

10. See generally Williston on Contracts (3rd ed., 1957) § 139. Moreover, the Chief of Police is an employee of the town and subject to the specific orders of the Board of Selectmen, the governing body of the town.

■ The next objection[2] raised by the defendants is that most of the highway over which the candlelight march would proceed is a state highway and outside the jurisdiction of the town. On this point Mass.G.L. c. 81, § 19, is decisive against the defendants in that it provides, "A town shall have police jurisdiction over all state highways within its limits."

■ The defendants also objected on the ground that they were powerless to permit an assembly on the steps of the town hall and the area immediately in front of it for the reason that title to the town hall is held by Trustees of the Stetson Fund Trust, who are elected by the voters of Randolph and over whom the selectmen have no control. However, there was no suggestion that the town hall would be open for other business on Friday night or that the trustees would have any objection to the use of the premises on the outside of the building. Cf. Marsh v. Alabama, 1946, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265.

■ The only objection of any substance raised by the defendants is that the proposed line of march would require diversion of shopping and other traffic along North Main Street for approximately three miles and there might be a traffic tie-up difficult for the police to handle. The court has considered this contention in the light of the plaintiff's plan, defendants' disinterest in suggesting an alternative route and a street map of the Town of Randolph received at the hearing. It is plain from the street map that there are several main thoroughfares more or less parallel to and intersecting with the line of march

2. The defendants also objected to the parade commencing "from the parking lot of the former A & P Store" on the ground that selectmen have no jurisdiction over private property. This objection was met by plaintiff's amending his application to a starting point on Bossi Avenue, as heretofore described.

proposed by the plaintiff, including High Street, North Street, the Fall River Expressway, Reed Street, Pond Street, Oak Street, Water-Main Street, Grove Street, and coincidentally Liberty Street. An equally important consideration is the relatively small number of marchers, only 200. They will not tie up the entire line of march for its entire duration. In all probability there will be no more than 150 yards between the beginning and end of the body of the parade.

There are no objective standards to guide decisions in the traffic regulation requiring permits for parades. If the regulation is viewed as permitting the outright prohibition of any particular parade, nothing has been brought to the attention of the court which limits in any way the discretion of those in whom lie the power to issue the permits. Standing in this light, the regulation falls squarely within the ambit of the many decisions of the Supreme Court "holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. Birmingham, 1969, 394 U.S. 147, 150–151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162. See cases cited therein at p. 151, n. 2, 89 S.Ct. 935.

The circumstances of this case show the wisdom of such a rule. There is every indication that the selectmen were largely, if not exclusively, influenced in their decision by their strong disagreement with the ideas that the plaintiff wished to communicate through the requested parade. As stated by the Supreme Court in Niemotko v. Maryland, 1951, 340 U.S. 268, 272, 71 S.Ct. 325, 328, 95 L.Ed. 267, "The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body." See also Cox v. Louisiana, 1965, 379 U.S. 536, 537, 85 S.Ct. 453, 13 L.Ed.2d 471.

As applied in this case the regulation was used to prevent the exercise of a First Amendment privilege, that is, a peaceful parade on public property. See Gregory v. City of Chicago, 1969, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134. The court is aware that the town has a legitimate interest in traffic control and public safety. See Cox v. New Hampshire, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049; Gregory v. City of Chicago, *supra*, (Black, J., concurring). But there has been no showing of any substance that a peaceful parade of only 200 persons would be inconsistent with those interests.

It is the court's recognition of these legitimate municipal concerns that has moved it to issue an order not simply enjoining the enforcement of an unconstitutional licensing regulation but rather requiring the issuance of a permit for a parade that is limited as to time, the number of marchers and the route to be taken. By the court's order the police of Randolph are given specific responsibility, in addition to their general responsibility which the court has no reason to believe they will fail to exercise, to afford the plaintiff and his fellow protesters appropriate protection while marching and assembling and at the same time to minimize the inconvenience to the general public.

Demonstrations and protest marches such as that planned by the plaintiff are relatively new on the New England scene. It will take a while before they are recognized and accepted by many citizens, including some public officials, as the lawful exercise of a basic right guaranteed by the Constitution of the United States. The strength and perhaps very existence of American democracy may well depend upon a truer understanding of the Bill of Rights by more people and their voluntarily giving it effect in their daily lives.