**FANTASY BOOK SHOP, INC., Lotten Books, Inc. and Journal Books, Inc., Plaintiffs, Appellants,**

v.

**CITY OF BOSTON, Kevin H. White, Robert J. Ryan, Boston Redevelopment Authority, Joanne A. Prevost, Joseph M. Jordan, Chinese Economic Development Council, Inc., Michael Obryon and William J. Leong, Defendants, Appellees.**

No. 81–1081.

United States Court of Appeals, First Circuit.

Argued April 7, 1981.

Decided June 16, 1981.

As Amended July 30, 1981.

---

**54.** Our deletions are indicated with an ellipsis (...) and our additions appear in italics.

Regina L. Quinlan, Boston, Mass., with whom Leonard A. Lucas, Boston, Mass., was on brief, for plaintiffs, appellants.

Laurie Burt, Boston, Mass., with whom John D. Patterson, Jr., and Foley, Hoag & Eliot, Boston, Mass., were on brief, for defendants, appellees Chinese Economic Development Corp., Inc., Michael Obryon and William J. Leong.

Arlene S. LaPenta, Boston, Mass., with whom Nicholas Foundas, Boston, Mass., was on brief, for defendants, appellees City of Boston, Kevin H. White, Joanne A. Prevost, and Joseph M. Jordan.

Margaret M. Brown and Harry G. Stoddard, Boston, Mass., on brief for defendants, appellees, Robert J. Ryan and Boston Redevelopment Authority.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

In this appeal we must decide whether a municipal ordinance governing the licensing of public amusements and exhibitions unconstitutionally interferes with the right of an adult book store to offer to the public a coin-operated motion picture business.

## I.

Since 1974 the City of Boston's zoning code has restricted operation of so-called adult uses to a single downtown Adult Entertainment District, popularly known as the Combat Zone. In addition, all "theatrical exhibitions, public shows, public amusements and exhibitions of every description" are required to obtain a license before they may operate for pay. This requirement, 14 City of Boston Codes §§ 426–428, has been enacted pursuant to a state statute authorizing such municipal regulation, Mass.Gen. Laws ch. 140, § 181. Section 181 was reenacted in 1979 after its predecessor, which empowered a municipality to deny a public amusement license upon finding only that granting one "would lead to violations of the public safety, health, or order", was declared unconstitutionally vague in *City of Fitchburg v. 707 Main Corp.*, 369 Mass. 748, 343 N.E.2d 149 (1976). A similarly worded Boston ordinance issued pursuant to that earlier statute had been declared unconstitutionally vague in *Galarelli v. White*, Civ.No. 73–2587–G (D.Mass. Sept. 21, 1973) (unpublished).

The statute as reenacted makes it a crime to operate a public amusement for pay without a license, and delegates the power to grant or deny licenses to local governments. The revised section material to this lawsuit [1] provides that:

1. Other sections of the statute require written application for a license, provide that local authorities must act on an application within 30 days, either to grant it or to order a hearing, and require that they make a final decision on the application within 45 days of such a hearing. Because appellants have sought relief against municipal officials only, and because those officials have based their decisions upon

"[T]he mayor or selectmen shall grant such license or shall deny such license upon a finding that issuance of such license would lead to the creation of a nuisance or would endanger the public health, safety or order by:

(a) unreasonably increasing pedestrian traffic in the area in which the premises are located or

(b) increasing the incidence of disruptive conduct in the area in which the premises are located or

(c) unreasonably increasing the level of noise in the area in which the premises are located."

The City ordinance in all material respects simply quotes the statute, with the significant exceptions of an added fourth ground for denial and a condition applicable to all four criteria. The added criterion, (d), allows denial if a license would "otherwise significantly harm[ ] the legitimate protectable interests of the affected citizens of the city", while the general condition provides that "no application shall be denied if the anticipated harm is not significant or if the likelihood of its occurrence is remote".

Plaintiffs-appellants are three adult book stores offering coin-operated motion pictures for pay in the city of Boston. They like others had operated their businesses without licenses since the earlier licensing regulations were declared unconstitutional. They became subject to the new licensing laws in 1979, and in July and August 1980 applied for licenses to operate their films through December 31, 1980.[2] They filed their applications with appellee Prevost, Executive Director of the Mayor's Office of Consumer Affairs and Licensing, to whom appellee White had delegated his authority

as Mayor of appellee City of Boston.[3] Prevost presided over hearings on the applications in September and October 1979, at which virtually all testimony focussed on nearby residents' objections to the activities in the Combat Zone as a whole. The only testimony directed with any specificity to appellants' applications came from representatives of organizations interested in purchasing and redeveloping the building in which appellants operated. This testimony, which was supplemented by a letter to Prevost, emphasized the importance of such redevelopment to the financial well-being of the surrounding community, and asserted that the existing uses would be incompatible with that redevelopment and could lead to future safety and traffic problems. These claims, in appellants' view, must be understood in the context of ongoing publicly-stated efforts by appellee White and others to "eliminate" the Combat Zone as a whole, and of appellee White's specific assertion that rehabilitation of this building would "remove five pornographic outlets from the city."

Prevost denied all three appellants' applications by identical letters dated November 17, 1980. Noting the proposed future use of the building, Prevost gave two grounds for her decision, closely tracking the second and fourth criteria of the city ordinance: that granting a license could increase disruptive and illegal conduct, and that it would not serve "the legitimate protectible interests of the affected citizens of the city". She also asserted, in accordance with the requirement of the ordinance, that "the anticipated harm is significant and the likelihood of its occurrence is not remote." In a later

the City ordinance, alone, our opinion addresses directly only that ordinance.

2. The parties are agreed that only appellants' coin-operated shows, and not their bookstores as a whole, are within the scope of the ordinance. Fantasy had filed an earlier application with respect to its film shows in October 1979, on which no action was ever taken. Appellants indicated that they intended to reapply for licenses for 1981 if they had been granted them for 1980. The statute prohibits reapplication for one year after a denial of a license except

upon a showing of substantially changed circumstances.

3. This appeal concerns principally these three appellees, together perhaps with appellee Jordan, Police Commissioner of the City of Boston. Other appellees, representing the Boston Redevelopment Authority and the Chinese Economic Development Authority, are proper parties only with respect to an alleged conspiracy to deprive plaintiffs of their constitutional rights that is not involved in this appeal.

affidavit, Prevost asserted that she did not deny the applications to facilitate the eviction of appellants, although she acknowledged that she acted in part because the building was scheduled for imminent redevelopment. The building was purchased on December 2, 1980, and eviction notices were sent to all three appellants on December 4.[4] Appellants' request for preliminary injunctive or declaratory relief was denied by the district court and this appeal followed.

## II

Appellants press essentially three arguments: that the ordinance is a form of prior restraint not justified as a time, place and manner restriction or by a compelling state interest; that the ordinance fails to provide necessary procedural safeguards for the denial of a license; and that the substantive standards established by the ordinance are both vague and overbroad, lacking narrow or definite standards and vesting the licensor with impermissible discretion. We address each in turn.

## A

■ Any government regulation that limits or conditions in advance the exercise of protected First Amendment activity constitutes a form of prior restraint, *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552–58, 95 S.Ct. 1239, 1243–46, 43 L.Ed.2d 448 (1976), and any such restraint comes "bearing a heavy presumption against its constitutional validity". *Id.* at 558, 95 S.Ct. at 1246, *quoting Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).[5]

■ At the same time, however, it is clear that not all prior restraints are constitutionally impermissible. *See Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Regulations governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975); *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). Put another way, a regulation that is directed primarily at conduct or at non-communicative aspects of protected expressive activities is permissible despite an incidental prior burden on expression if it is justified by sufficiently strong permissible government interests. *See Konigsberg v. State Bar of California*, 366 U.S. 36, 50–51, 81 S.Ct. 997, 1006–1007, 6 L.Ed.2d 105 (1961). These standards have been stated in terms of a four-part test:

> "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on ... First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

*See generally* Tribe, *American Constitutional Law*, §§ 12:2 at 580–82, 12:20 at 682–84 (1978) (unlike government action aimed at communicative impact, action aimed at non-communicative impact but having impact on communication will be analyzed by balancing regulatory interests against First

---

**4.** The notices declared that appellants were in violation of their leases by operating public amusements without a license. Two appellants occupy the premises under lease, while the third is a tenant at will. The tenant at will is apparently not subject to immediate eviction by virtue of an applicable state redevelopment statute requiring 120 days prior notice. *See* Mass.Gen.Laws ch. 79.

**5.** Although appellees urge that this case should be characterized as a zoning or commercial regulation case rather than a First Amendment case, they have never disputed that appellants' film offerings are within the scope of the First Amendment. *See Schad v. Borough of Mount Ephraim*, —— U.S. ——, ——, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981).

Amendment values; only "unduly" restrictive regulations unconstitutional).

■■■ We think the ordinance before us is not *per se* impermissible as a prior restraint under these standards. On the dispositive question of defining the interests the regulatory scheme is designed to address, *see* Tribe, *supra,* § 12:20 at 685–86, we limit our scrutiny to the first three grounds authorized for the denial of licenses. *See* Part II C, *infra.* First, a law requiring the licensing of routine commercial operations in an attempt to limit noise, traffic and disruption is clearly within a state's constitutional power. Second and third, those interests may well be said to be important, and are in themselves entirely unrelated to the suppression of expression. Finally, since the interests thus defined require regulation of public amusements whose content is within the First Amendment no less than they require regulation of any other public amusements, and since the market for coin-operated adult films as a whole is "essentially unrestrained", the regulation's inclusion of the latter is not broader than is essential to the furtherance of those interests. *See Young v. American Mini-Theaters,* 427 U.S. 50, 62–63, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (majority opinion); *Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 826–28 (4th Cir. 1979).[6]

**B**

Our conclusion that an ordinance regulating the licensing of public amusements is not *per se* unconstitutional as a prior restraint requires us to consider whether the ordinance before us is constitutionally valid in its particular features. Appellants argue that it is invalid in two respects, one of which is essentially procedural and the other substantive.

Appellants' procedural claim is that a licensing scheme serving as a prior restraint must provide various safeguards before any decision denying a license may be given effect, including adequate administrative procedures, licensor-initiated judicial review, and prompt appellate review of that decision. This claim finds support in a line of cases establishing that such procedural protections are constitutionally necessary for any regulatory scheme in which licensing decisions are made on a content-specific basis. *See Southeastern Promotions Ltd. v. Conrad, supra,* 420 U.S. at 558–60, 95 S.Ct. at 1246–1247; *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Appellants recognize that this case differs from those in that it involves facially content-neutral regulations, but they argue that the same safeguards are nonetheless required. Because the projected effects cited by appellee Prevost in denying the licenses are ascribed exclusively to the clientele of adult films, appellants reason, the ordinance has a content-specific *effect* fully as strong as if the content distinction appeared on its face. Appellees counter that the ordinance is concerned only with the stated criteria of noise, traffic, and disruption, and that any positive correlation between those effects and a particular kind of film content is purely accidental.[7]

---

**6.** We reject as well appellants' argument that the statute and the ordinance are facially underinclusive by reason of their failure to subject non-commercial amusements to the same licensing requirements. We think a legislature could reasonably conclude that non-commercial amusements present sufficiently less likelihood of the harms sought to be prevented to justify their differential treatment. It might, for example, reasonably conclude that the patrons of charitable or educational amusements would present less likelihood of excessive noise or disruptive or illegal conduct, two of the effects at which the ordinance is directed. *Cf. Schad,* —— U.S. at —— n. 5, 101 S.Ct. at 2181

n. 5 (noting without criticism that statute distinguished between commercial and non-commercial entertainments).

**7.** Appellees appear to acknowledge, however, that this correlation is high if not perfect, conceding at oral argument that they would likely not expect the projected negative effects from—or deny a license to—a business showing, for example, Audubon Society films. The case for requiring procedural safeguards might be weaker where all films were treated alike, even if the result were that no films could actually be shown at a particular location. *See Schad,* —— U.S. —— – ——, 101 S.Ct. 2183–2187.

■ We see merit in each of these positions, for we think it true that the ordinance has both facially neutral criteria and effectively non-neutral impacts. In such circumstances, we think the full panoply of procedural safeguards required for facially content-specific regulations must be held not to apply unless a rejected applicant can demonstrate that, either in general or in a particular case, the neutral criteria asserted served as a mere pretext for what were in fact content-directed decisions. In the absence of such a showing, a statute must be accepted as a valid police power/land use regulation not directly implicating First Amendment values. As a result, such a statute need not provide for prior licensor-initiated judicial review, an unusually restrictive and intrusive safeguard required only where expressive content is directly censored. *See Freedman v. Maryland, supra*, 380 U.S. at 57, 85 S.Ct. at 738. At the same time, however, the First Amendment requires that a regulation having a significant indirect impact on protected activity must provide certain important procedural safeguards not necessarily required of every valid governmental regulation. *See Vance v. Universal Amusement Co.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (*per curiam*). At a minimum, such a regulation must provide for adequate administrative proceedings, including notice and a hearing, *see Carroll v. President and Comm'rs. of Princess Anne*, 393 U.S. 175, 181–183, 89 S.Ct. 347, 351–52, 21 L.Ed.2d 325 (1968), and for expeditious decision by the administrator, *see Freedman v. Maryland, supra*, 380 U.S. at 59, 85 S.Ct. at 739; *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141, 88 S.Ct. 754, 755, 19 L.Ed.2d 966 (1968). In addition, judicial review of a denial must be available promptly, *see id.* at 142, and appellate review of that decision immediately available as well, *see National Socialist Party v. Village of Skokie*, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) (*per curiam*). Appellants have not alleged that such safeguards were lacking in this case, and we see no reason to conclude that the licensing scheme is procedurally deficient. *See generally* Tribe, *supra*, at § 12:36; Monaghan, *First Amendment "Due Process"*, 83 Harv.L.Rev. 518, 532–43 (1970).

■ In addition, however, a party asserting that facial neutrality is a mere ruse for *de facto* content discrimination, as appellants have alleged here,[8] must also be given an opportunity to prove that claim. *See generally* Tribe, *supra*, at § 12:5. Because it is not disputed that the activities denied licenses in this case are within the scope of the First Amendment, proof that licenses were denied on the basis of content-based criteria would call not for added procedural measures but for invalidation of the denials. Whether such criteria were applied, moreover, can be determined only by a fact-specific examination of actual decisions, and not from the face of the ordinance. Accordingly, resolution of this claim turns on the inquiry into the substantive criteria undertaken in the following section, and does not affect the procedural requirements discussed in this section.

## C

■ The first three of the ordinance's substantive licensing criteria relate to noise, traffic, and disruptive conduct, while the fourth addresses "legitimate protectible interests of ... affected citizens." Appellants assert that these standards are impermissibly vague, failing to provide "narrow, definite and objective" standards and vesting excessive discretion in a licensor, *see Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Saia v. People of State of New York*, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed.2d 1574 (1948), and that they are unconstitutionally overbroad as well.[9] Appellees counter that the standards

---

**8.** As noted above, *see* n. 4 *supra*, appellants have in a claim not presently before us alleged a conspiracy on the part of appellees to deprive them of their constitutional rights.

**9.** While related, these two doctrines derive from somewhat different policies and look to different effects. Overbreadth analysis looks to whether a law "sweeps within its ambit [protected] activities" as well as unprotected

set forth are "exacting", and argue that whatever degree of imprecision they may contain it is necessary to the achievement of legitimate state objectives. *See Broadrick v. Oklahoma*, 413 U.S. 601, 607–08, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).[10]

■ We agree with appellees as to the first three criteria but with appellants as to the fourth. Each of the first three, taken verbatim from the authorizing statute, describes a behavioral effect of at least potential objective specificity. While the dispositive levels of noise or traffic are not identified, applicants are apprised of the factors that will determine the licensing decision, and those factors are susceptible to quantification, measurement, and, thus, meaningful judicial review. The same is true, albeit less unequivocally, of "disruptive or illegal conduct"; while the contours of this factor may be vague enough to encompass impermissible grounds, the factor itself is at least capable of objective measurement, and its vagueness may be reasonably necessary to embrace all of its legitimately intended objectives without creating an encyclopedic and unwieldy ordinance. *See Broadrick v. Oklahoma, supra*, 413 U.S. at 605, 93 S.Ct. at 2912. Where a standard is not so vague that reasonably intelligent people "must necessarily guess

at its meaning", *see* note 9 *supra*, we must presume that state courts will give it a limiting construction that will preserve its facial constitutionality, *see Erznoznik v. City of Jacksonville, supra*, 422 U.S. at 216, 95 S.Ct. at 2276, and reserve questions of its constitutionality as applied for appropriate fact-finding. *See* Part III *infra*.

■ The fourth criterion, by contrast, authorizes denial of a license on the basis of an unspecified assessment of "legitimate protectible interests of ... affected citizens", itself a factor of uncertain content. This factor represents little particularization, and indeed may well represent an expansion, of the "endanger the public health, safety or order" standard that it purports to specify—a standard which, as noted above, has earlier been declared unconstitutional in both state and federal court. *See* Part I *supra*. Unlike the "disruptive or illegal conduct" standard, which serves as a necessary shorthand for a variety of particular objective occurrences, this "public interest" standard comprises purely subjective evaluations of wholly unrestricted factors, and thus vests the denial of a license in the essentially unbridled discretion of a municipal administrator.[11] *See* Tribe, *supra*, § 12:35 ("overbroad delegation" of power to license protected activities facially

ones, *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940), while a vagueness inquiry focusses on whether a law states its proscriptions in terms sufficiently indefinite that persons of reasonable intelligence "must necessarily guess at its meaning". *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973), *quoting Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See Grayned v. City of Rockford*, 408 U.S. 104, 108–114, 92 S.Ct. 2294, 2298–2302, 33 L.Ed.2d 222 (1972); *Landry v. Daley*, 280 F.Supp. 938, 951–52 (N.D.Ill.1968) (three-judge court). Because the ordinance before us does not purport to regulate the content of permissible activity in any way, but does state prohibitions that serve to preclude protected activity by their effect, we think a vagueness analysis more appropriate than an overbreadth analysis and address appellants' claims in those terms. *But see* Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 871–75 (1970) (vagueness and overbreadth concerns not entirely separable).

10. Appellees also assert that appellants lack standing to raise vagueness or overbreadth claims because the criteria "unquestionably" justify denial of their own licenses. As will be discussed below, we think it far from unarguable that the standards do so apply, and accordingly reject the standing challenge. *See Parker v. Levy*, 417 U.S. 733, 753–58, 94 S.Ct. 2547, 2560–62, 41 L.Ed.2d 439 (1974); *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972).

11. Because this fact is inherent in the nature of the fourth criterion, its effect is not alleviated by the ordinance's further provision that a license not be denied "if the anticipated harm is not significant or if the likelihood of its occurrence is remote". While this dictate is of importance with respect to the constitutionality of the first three criteria set forth, *see* Part III *infra*, it cannot save a standard that is invalid even if anticipated harm is arguably "significant" in a particular case. This conclusion, of course, does not affect the constitutionality of criteria of adequate specificity that might be thought components of this general standard—

invalid). We think that where a license is necessary for the exercise of protected activity such a standard cannot withstand constitutional scrutiny. *See Southeastern Promotions, Ltd. v. Conrad, supra*, 408 U.S. at 548, 95 S.Ct. at 1241 ("best interests of the community" standard held vague); *Shuttlesworth v. City of Birmingham, supra*, 394 U.S. at 149, 89 S.Ct. at 937 ("public welfare, peace, safety, health, decency, good order, morals or conscience" standard held vague); *Evansville Book Mart v. City of Indianapolis*, 477 F.Supp. 128 (S.D.Ind.1979) ("the effect of the proposed business ... upon the surrounding property and upon residents or inhabitants thereof" held vague). We thus find this provision facially invalid. *See Erznoznik v. City of Jacksonville, supra*, 422 U.S. at 215–17, 95 S.Ct. at 2275–76.[12]

### III

In her letters denying appellants' applications, appellee Prevost relied on the second and fourth grounds for denial set forth in the ordinance. Having concluded that the second ground is not facially unconstitutional, we must consider whether its application to appellants in this instance nonetheless deprived them of their constitutional rights.[13] The relevant facts are set forth in Part I, *supra*, and we need address only a critical few at this point. At the public hearing, virtually all those objecting to appellants' applications based their objections on conditions in the Combat Zone as a whole. Only two parties opposed appellants' applications with any specificity, and those parties represented the two organizations seeking to redevelop the building for other uses. Those parties asserted that appellants' operations would be incompatible with that redevelopment and could lead to future traffic and safety problems, although it seems a fair appraisal to say that their principal focus was on the importance of the proposed redevelopment to the financial health of the surrounding community.

In addition, several other undisputed background facts in the record can be read to support appellants' contention that the denial of their licenses reflected a concerted effort to evict them rather than a dispassionate appraisal of the probability of increased disruptive or illegal conduct. The building in which all three appellants operate their business is the site of a proposed $6,000,000 commercial renovation project. One condition apparently imposed by the principal projected tenant is the eviction of all present tenants.[14] Appellee White has consistently identified this renovation project as a significant component of the city's effort to eliminate the Combat Zone as a whole, and those opposing appellants' applications have emphasized similar goals. Finally, an affidavit submitted by appellee Prevost in explanation of the license denials acknowledges that it resulted in part from

perhaps, for example, that denial of a license would lead to the creation of more jobs than would granting it.

**12.** This conclusion is in our view consistent with the recent decision of the Massachusetts Supreme Judicial Court in *Commonwealth v. Blackgammon's Inc.*, (1981) Mass.Adv.Sh. 445, —— Mass. ——, 417 N.E.2d 377. The court in *Blackgammon* sustained the validity of the city ordinance before us as against a challenge by a defendant operating jukeboxes and offering "recreational dancing". The court distinguished its earlier holding in *City of Fitchburg v. 707 Main Corp.*, 369 Mass. 748, 343 N.E.2d 149 (1976) (*see* Part I *supra*), on the ground that the types of entertainment involved in *Blackgammon* "are not to the same extent forms of expression protected by the First Amendment". *Id.* at 457, —— Mass. at ——, 417 N.E.2d 377. The types of entertainment before us, of course, are fully protected by the First Amendment, and this fact is critical to our holding.

**13.** This discussion necessarily rests on an implicit conclusion that the ordinance is properly held severable. In the absence of any suggestion that the city did not intend the ordinance to be severable, we think that conclusion justified by the entirely separate nature of the two sections and the coherent regulatory system remaining after one is invalidated. *See United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968).

**14.** The redevelopers sent notices of eviction to appellants, on the ground that they had violated their leases by operating their businesses without required licenses, two days after the Chinese Economic Development Council, Inc., purchased the Boylston Building. *See* n. 4, *supra*.

the imminent redevelopment of the building, although it also asserts that the denial was not intended to aid in appellants' evictions.

 We think these facts taken together provide enough support for appellants' contention that their licenses were in fact denied on impermissible grounds to warrant a factual determination of that issue by the district court. Particularly where, as here, the facially valid statutory criterion relied upon approaches the outer limits of permissible vagueness, the denial of a license for protected activity must be based on, and accompanied by articulation of, specifically identifiable findings. In addition, even were a denial found to have been premised on a finding that would be of adequate constitutional specificity if applied explicitly, the vagueness doctrine demands that this criterion be fairly within the permissible statutory standard as well. Finally, where significant evidence of content-specific considerations looms in the background, courts must scrutinize the reasons asserted in support of a decision with the care necessary to preserve the First Amendment interests at stake; if a regulation that purports to be directed at noncommunicative activity is found to be directed in fact at communicative activity, a much stricter standard of review of asserted government interests must be applied. *See Erznoznik v. City of Jacksonville, supra,* 422 U.S. at 214–15, 95 S.Ct. at 2275; *Young v. American Mini-Theaters, supra,* 427 U.S. at 84, 96 S.Ct. at 2459 (Powell, J., concurring); Tribe, *supra* §§ 12:2 at 580–82, 12:5 at 591–93.

 The denial of appellants' applications must be evaluated in light of these standards. The only indication anywhere in the record that speaks with any specificity to the permissible ground for the denials appears in the letters announcing them:

"Based on our inspections of these and similar premises, it is our opinion that the contact between peep show patrons and those persons who would utilize the "Boylston Building" for renovation, business, and training purposes would increase the incidence of illegal or disruptive conduct in the area. Specifically, we find that the chances of theft, vandalism, assault, and battery would increase."

While this conclusion might well be constitutionally sufficient if supported by evidence of some kind in the record, it stands at present as a mere assertion.[15] *See Schad v. Borough of Mount Ephraim,* —— U.S. ——, ——, 101 S.Ct. 2176, 2183, 68 L.Ed.2d 671 (1981); *id.* at ——, 101 S.Ct. at 2187 (Blackmun, J., concurring). Although we recognize that predictions of future disruption must by definition be based on inferences and projections, the government bears the burden of proving some empirical basis for the projections on which it relies. *See Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. at 1332, 1342, 2 L.Ed.2d 1460 (1958). We do not, of course, hold that no such basis exists, but leave for the district court the task of determining as a matter of fact both whether there was a factual basis for appellee Prevost's conclusion as to increased disruption and whether that conclusion rather than content-based considerations actually motivated the denial of appellants' applications in this case.

### IV

In closing, we note briefly the nature of the remedy that would be appropriate if the district court were to find that appellees failed to demonstrate a sufficient basis for the license denials. Appellants have focussed their arguments on their request for a preliminary injunction, and both their briefs and appellees' briefs have argued at length the elements of irreparable harm, balance of injuries, and public interest that are necessary to the granting of preliminary injunctive relief. *See Planned Parent-*

---

15. Discussion during oral argument indicated that an on-site investigation and search of police files had revealed no evidence of any actual disruptive conduct connected with appellants' businesses. Appellees discount these facts as not reflecting the different occupancy pattern expected after the building is renovated, and asserted at oral argument that "inevitable realities" of redevelopment provided support for the finding in question. One fact that this distinction may fail to account for is that because only appellants' film operations require licenses, patronage of their book stores could continue as before.

hood League of Massachusetts v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981). Appellants' complaint, however, also sought declaratory relief, and in a suit challenging the constitutionality of an act such relief offers an alternative remedy which does not require a showing of those elements. See generally 6A Moore's Federal Practice § 51–18[2] at 57–182 (2d ed. 1979); 7 id. § 65–18[2] at 65–132. We have reviewed their claim as a request for declaratory relief—declaring certain provisions of the ordinances facially constitutional and another facially unconstitutional, and remanding to the district court for a factual finding necessary to a determination of the constitutionality of the valid provision as applied—and accordingly express no view on those elements relevant only to the issuance of injunctive relief.

Finally, we think it appropriate to add a word on the impact of this case in pragmatic social policy terms. We recognize that the City of Boston, persons living and working in the Combat Zone and adjacent areas, and other parties have strong and legitimate interests both in fostering the kind of economic redevelopment underlying this case and in assuring that such projects may proceed free from excessive disruption. Because it may strike some as an unwarranted judicial intrusion to impede that redevelopment for the sake of a few operators of pornographic peep shows, two points bear emphasis. First, as noted above, appellees have never contended that the movies shown by appellants are obscene or otherwise not within the First Amendment, and—as a majority of the Supreme Court has recently reaffirmed—sexually explicit but non-obscene materials, however distasteful, are entitled to no less protection than other forms of expression. See Young v. American Mini-Theaters, supra, 427 U.S. at 73, 96 S.Ct. at 2453 (Powell, J. concurring); id. at 84 (dissenting opinion of four Justices); Hart v. Edmisten Book Stores, supra, 612 F.2d at 826–28. Second, our holding in no way diminishes appellees' ability to regulate the location of businesses such as appellants' in any of three distinct ways: to enforce their eviction at the expiration of their leases; to do so under their

leases, for operating without a license, after proper application of permissible licensing criteria (which appellees may be able to demonstrate on remand that their earlier action with respect to these appellants did in fact represent); or to enact the kind of non-licensing, non-discretionary zoning law, not unduly restrictive of the overall availability of a particular formal expression that has been approved by a majority of the Supreme Court. See Young v. American Mini-Theaters, supra, 427 U.S. at 62–63, 96 S.Ct. at 2448 (opinion of five Justices).

In sum, we can put the matter no better than did the Supreme Court in Erznoznik v. City of Jacksonville, supra, 432 U.S. at 217–18, 95 S.Ct. at 2276–2277:

"In concluding that this ordinance is invalid we do not deprecate the legitimate interests asserted by the city. . . . We hold only that the present ordinance does not satisfy the rigorous constitutional standards that apply. . . . Where First Amendment freedoms are at stake we have repeatedly emphasized that precision of drafting and clarity of purpose are essential. These prerequisites are absent here."

Vacated and remanded.